IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| DOBSON BROTHERS CONSTRUCTION COMPANY, a Nebraska corporation,<br><br>              Plaintiff,<br><br>v.<br><br>RATLIFF, INC., an Oklahoma corporation, and AMERICAN CONTRACTORS INDEMNITY COMPANY, a California corporation,<br><br>              Defendants. | 4:08CV3103<br><br>**MEMORANDUM AND ORDER** |

    What remains of this dispute are claims asserted by Dobson Brothers Construction Company ("Dobson") that its subcontractor's surety, American Contractors Indemnity Company ("ACIC"), owes Dobson money under a performance and payment bond ACIC issued to secure the subcontractor's performance of a highway construction subcontract. Pending before the court are ACIC's motions for partial judgment on the pleadings (filing 42) and for summary judgment (filing 131).

### A. UNDISPUTED MATERIAL FACTS

    1.    On or about April 10, 2007, plaintiff Dobson entered into a prime contract with the Oklahoma Department of Transportation ("ODOT") for a project commonly known as ACNHY-009N(082)GB, Cordell, Oklahoma. (Filing 24, Amended Complaint ¶ 5.)

2.      On or about June 18, 2007, defendant Ratliff, Inc., ("Ratliff") entered into a subcontract with Dobson to install certain sewer and water lines on the project (the "subcontract"). (Filing 24, Amended Complaint ¶ 6 & Ex. A; Filing 32, ACIC's Answer ¶ 6; Filing 153-1 (copy of subcontract excluding documents that were incorporated therein such as schedule).) The subcontract between Ratliff and Dobson allowed Dobson to supplement Ratliff's work upon Ratliff's default. (Filing 153-1, Dobson-Ratliff Subcontract ¶ 6.2 ("If Subcontractor fails to so cure [the default], Contractor may, at its sole option, assist in completing the Subcontract Work or may take over the Subcontract Work.").)

3.      On or about June 6, 2007, Ratliff obtained payment and performance bonds for the project from defendant ACIC, a commercial surety. The penal sum of the bonds was $885,003.20, the original amount of the subcontract, and the bonds generally secured Ratliff's performance under the subcontract. (Filing 24, Amended Complaint ¶ 10; Filing 32, ACIC's Answer ¶ 10; Filing 131-4, Performance Bond; Filing 131-5, Payment Bond.)

4.      The performance bond contained certain conditions precedent that were required to be observed by the obligee, Dobson, should it decide to declare the principal, Ratliff, to be in default:

> If there is no Obligee default, the Surety's [ACIC's] obligation under this Bond shall arise after the Obligee has notified the Principal at the address specified, and the Surety by certified mail at 9841 Airport Blvd., 9th Floor, Los Angeles, CA 90045 that the Obligee is considering declaring a Principal Default and has requested and attempted to arrange a conference with the Principal and the Surety to be held not later than 15 days after receipt of such notice to discuss methods of performing the Construction Contract; and the Obligee has declared a Principal Default and formally terminated the Principal's right to complete the contract. Such Principal Default shall not be declared earlier than 20 days after the Principal and the Surety have received notice as provided and the Obligee has agreed to pay the balance of the contract price to the Surety

in accordance with the terms of the construction contract or to a contractor selected to perform the construction contract in accordance with the terms of the contract with the Obligee.

(Filing 131-4.)

5. The performance bond contained the following language concerning changes to the bonded contract that increased or changed the scope of the project, resulting in a change in contract price:

It is a condition hereof that any change, alteration, modification or amendment of any nature whatsoever that may be made in the terms of said agreement, any change in the character or scope of the work to be performed, or the method of performance, under said agreement or modification of said agreement or in the time for completion thereof, any change in the manner, time or amount of payment as provided therein, any change of any nature whatsoever that may be made in the terms of the contract between the said Obligee and the Owner or any change that may be made in the performance of the work under said agreement by the Principal, assented to by the Obligee, whether made under express agreement or not, may be made without notice to the Surety and without affecting the obligations of the Surety *as long as changes are not in excess of fifteen percent (15%) of the original contract terms*. Any changes in excess of this percentage will need consent of Surety.

(Filing 131-4 (emphasis supplied).) Thus, the performance bond required ACIC to consent to any changes to Ratliff's subcontract amount in excess of 15% of Ratliff's contract. Further, the performance bond twice provided that no person or entity "other than the named Obligee and the successors, administrators, or assigns of the Obligee" or its "heirs [or] executors" shall have a "right of action under this bond." (Filing 131-4.)

6. ACIC was obligated under the terms of the Dobson-Ratliff payment bond to "indemnify and save harmless [Dobson, as Obligee] from all loss, liability, costs,

damages, penalty, attorneys' fees and expenses" incurred by Dobson in connection with Ratliff's work. The payment bond also required ACIC to promptly and fully pay "the claims of all persons, firms or corporations, performing labor or furnishing equipment, materials or supplies incurred in connection with" Ratliff's work. (Filing 131-5, Payment Bond.)

7. By letter dated February 27, 2008, Dobson terminated its subcontract with Ratliff. (Filing 153-1, Letter from Dobson to Ratliff ("Due to lack of any meaningful response by Ratliff, as requested in our letter dated February 15, 2008 of final notice and the failure to provide the necessary crews and equipment to man the job and perform the work properly, we are terminating your contract."); Filing 24, Amended Complaint ¶ 21.)

8. On May 14, 2008, Dobson filed its original complaint in this action naming ACIC and Ratliff as defendants and alleging a performance bond claim against ACIC and a breach of contract claim against Ratliff for Ratliff's failure to perform its obligations under the subcontract.

9. More than one month after filing suit against ACIC and Ratliff, Dobson sent letters dated June 26, 2008, and July 31, 2008, to both ACIC and Ratliff giving notice that it was making a claim on the bond issued by ACIC in the amount of $2,214,267.03. The July 31, 2008, letter noted that Ratliff had failed to respond to Dobson's June 26, 2008, letter. (Filing 131-11.)

10. On June 30, 2010, Dobson amended its complaint in this action to include a new claim against ACIC under the payment bond, as well as a claim for breach of contract against ACIC and Ratliff for failure to reimburse Dobson for the payments Dobson allegedly made on Ratliff's behalf to suppliers of labor and materials to complete Ratliff's subcontract work. (Filing 24, Amended Complaint ¶¶ 30-35.)

11.     Ratliff filed a counterclaim against Dobson alleging breach of contract and/or an action sounding in quantum meruit seeking compensation for work performed by Ratliff pursuant to the subcontract for which Dobson had failed to pay Ratliff. (Filing 31.)

12.     Because the Ratliff subcontract with Dobson contained a provision that any subcontract disputes should be decided by arbitration between the parties, Ratliff moved to compel Dobson to arbitrate those disputes. After the issuance of two comprehensive reports and recommendations by the magistrate judge, I found that the contract disputes between Ratliff and Dobson were subject to binding arbitration, and I ordered those parties to arbitrate their contract disputes.[1] (Filings 66, 82, 98, 103.)

13.     For eleven days between November 2, 2009, and January 3, 2010, Ratliff and Dobson arbitrated their contract disputes before private arbitrator Jerome Bales, who on February 22, 2010, issued his decision concerning those contract disputes. Arbitrator Bales found that Ratliff had breached its subcontract with Dobson, and that Dobson was entitled to recover $555,813.96[2] from Ratliff as a result of that breach. (Filing 131-12, Arbitration Award.) Specifically, the arbitrator found that:

> Ratliff materially breached its contract with Dobson by failing to start its work on time (it began three weeks late and without justification), failing to progress its work per the agreed CPM schedule, failing to staff and

---

[1] While Dobson also sought to compel ACIC to participate in the arbitration between Ratliff and Dobson, this court denied Dobson's motion to compel ACIC to arbitrate on March 27, 2009. (Filing 103.)

[2] This amount was calculated by adding time-related costs ($388,079.64), pre-termination costs to supplement Ratliff's work ($248,856.88), post-termination costs to complete and correct Ratliff's work ($707,023.92), and incentive/disincentive damages ($360,000.00) for a subtotal of $1,703,960.44. Subtracted from that amount was $1,148,146.48 (adjusted contract value of $1,531,721.47 minus payments made to Ratliff). (Filing 131-12 at CM/ECF p. 5.)

5

equip the work properly, and failing to perform the work in a workmanlike manner. Therefore, Dobson justifiably terminated Ratliff's Subcontract . . . .

14. The arbitrator also found that Ratliff's subcontract amount should be adjusted from $885,003.20 to $1,531,721.47 to include the value of four approved change orders (7, 9, 11, and 12), an increase of approximately 73% from the original subcontract amount. The parties agree that Dobson is bound by the arbitrator's determination concerning increases to Ratliff's subcontract. (Filing 131-12 at CM/ECF p. 5 n.1.)[3]

## B. STANDARD OF REVIEW

The Eighth Circuit Court of Appeals has recently clarified the appropriate standard for consideration of motions for summary judgment:

Summary judgment is proper if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. The movant bears the initial responsibility of informing the district court of the basis for its motion, and must identify those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts. Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not

---

[3] ACIC acknowledges that it agreed to be bound by the determination of the arbitrator with regard to the disputes between Ratliff and Dobson and that the arbitrator found that Ratliff was terminated for cause. (Filing 131-1 at CM/ECF p. 6 n.1.)

6

those of a judge. The nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts, and must come forward with specific facts showing that there is a genuine issue for trial. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

*Jackson v. United Parcel Service, Inc.*, 643 F.3d 1081, 1085 (8th Cir. 2011) (quoting *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc)).

### C. ACIC'S MOTIONS

ACIC asserts two grounds for its motions: (1) Dobson's claim against ACIC under the payment bond must fail because Dobson cannot assert a direct claim under the bond, nor can it assert a claim as a subrogee; and (2) ACIC is entitled to judgment on Dobson's performance bond claim because Dobson failed to meet the conditions precedent in the bond that would trigger ACIC's liability. Because ACIC makes identical arguments in its motion for partial judgment on the pleadings (filing 42) and its motion for summary judgment (filing 131) regarding the propriety of Dobson as a payment bond claimant, I shall deny as moot ACIC's motion for partial judgment on the pleadings and consider the argument in the context of ACIC's summary judgment motion.

**1. Whether Dobson is Entitled to State Claim for Relief Under Payment Bond as Claimant or Under Principles of Subrogation**

**a. Dobson as Direct Claimant Under Payment Bond**

"'A surety cannot be held beyond the precise terms of his contract. . . . The liability of a surety, therefore, is measured by, and will not be extended beyond, the strict terms of his contract.'" *Nebraska Beef, Ltd. v. Universal Surety Company*, 607

7

N.W.2d 227, 233 (Neb. Ct. App. 2000) (quoting *Farmers Union Co-op Assn. v. Mid-States Constr. Co.*, 322 N.W.2d 373, 377 (Neb. 1982)).[4]

Relying on *Cagle v. Sammons*, 254 N.W.2d 398 (Neb. 1977), ACIC argues that Nebraska courts "have consistently held" that general contractors like Dobson which supplement a subcontractor's forces or take over a subcontractor's work are "barred from asserting a payment bond claim" because payment bonds are intended to protect those who provide labor, materials, and equipment—not the obligee of a bond—and "the general contractor does not enter into a contract to supply labor and materials to its own subcontractor." (Filing 131-1, ACIC Br. at CM/ECF p. 13.) ACIC asserts that Dobson, "as the general contractor on the Project and the Obligee under the bond, may properly assert a *performance* bond claim . . . , but [Dobson] is not a proper *payment* bond claimant." (Filing 131-1, ACIC Br. at CM/ECF p. 18 (emphasis added).)

In *Cagle*, the plaintiff general contractor brought suit against its subcontractor and the subcontractor's surety claiming that (1) the subcontractor had failed to perform a substantial part of the work required by the subcontract and (2) the obligee, in paying for the labor and materials used to complete the bonded contract work, became a payment bond claimant as that term was defined in the payment bond for "costs and expenses for labor and material which Plaintiff has paid, or become obligated to pay." *Cagle*, 254 N.W.2d at 401. The Nebraska Supreme Court found

---

[4]Dobson notes that "[t]here is some question as to whether Oklahoma or Nebraska law should apply to the issues raised by ACIC on the bond, as the Prime Contract is governed by Oklahoma law and the Subcontract is governed by Nebraska law. However, as Nebraska and Oklahoma apply consistent rules of law as to whether general contract principles apply to interpreting bond obligations, this Court need not determine which state's law applies . . . ." (Filing 152 at CM/ECF p. 14 n.1.) ACIC does not claim that Oklahoma law applies, but instead makes its arguments based on Nebraska case law. (Filings 131-1 & 154.) Therefore, I shall also apply Nebraska law.

that the general contractor did not state a cause of action against the surety under the bond because the bond defined eligible "claimants" in a way that excluded the plaintiff general contractor—that is, the bond defined a "claimant" who "may sue on this bond" as one having "a direct contract with the Principal for labor, material, or both, used or reasonably required for use in the performance of the contract." *Id.* at 402.

Even though a provision in the *Cagle* subcontract permitted the general contractor to take over the subcontract, complete the work, and charge the cost thereof to the subcontractor, such language did "not make [the general contractor] a claimant as defined in the bond, for in such a situation [the general contractor] would have no direct contract with [the subcontractor] to provide labor or materials to [the subcontractor]." In sum, "the fact that [the general contractor] could take over the subcontract on [the subcontractor's] default does not bring [the general contractor] within the definition of a claimant as set forth in the bond." *Id.* at 403.

Unlike the situation in *Cagle*, there is no language in the ACIC payment bond that requires a direct contract between Ratliff and a bond claimant. Rather, the language of the payment bond obligated ACIC to "indemnify and save harmless [Dobson, as Obligee] from all loss, liability, costs, damages, penalty, attorneys' fees and expenses" incurred by Dobson in connection with Ratliff's work. The payment bond also required ACIC to promptly and fully pay "the claims of all persons, firms or corporations, performing labor or furnishing equipment, materials or supplies incurred in connection with" Ratliff's work. (Filing 131-5, Payment Bond.)

There is no indication within the terms of the payment bond that a claimant is required to be a subcontractor or supplier with a direct subcontract or supply contract with Ratliff to be entitled to state a claim under the terms of the payment bond. Indeed, other language within the payment bond indicates that it is possible that an entity *without* a direct contract may state a claim. For instance, certain notice requirements in the payment bond pertain only to "Claimants who are employed by

or *have a direct contract* with the Principal," while other notice requirements relate to "Claimants who *do not have a direct contract* with the Principal." (Filing 131-5, Payment Bond (emphasis added).)

Because there is nothing within the language of the payment bond (filing 131-5) that would bar Dobson from asserting a claim against ACIC on the bond, and because ACIC "is bound in the manner and to the extent provided in the obligation," Dobson is a proper payment bond claimant in this case. *Cagle*, 254 N.W.2d at 402 (internal quotation omitted). Therefore, ACIC's motion for summary judgment on this ground must be denied.

### b. Dobson as Subrogee Under Payment Bond

Dobson's fourth claim for relief alleges that it was "compelled by legal and/or moral obligation, and/or by a need to protect its own rights or interests, to pay Ratliff's subcontractors . . . and/or to hire laborers and subcontractors . . . to replace Ratliff and supplement Ratliff's work" upon Ratliff's default, and that the costs incurred by Dobson following Ratliff's nonperformance should have been paid by ACIC under the payment bond. (Filing 24 ¶¶ 32-35.) This is a subrogation claim. *Nebraska Beef, Ltd.*, 607 N.W.2d at 235-36 ("Generally, subrogation is the right of one, who has paid an obligation which another should have paid, to be indemnified by the other.").

> Absent an agreement, the doctrine of subrogation applies only when a party pays the debts of a third person, not as a volunteer, but either out of a legal or moral obligation to do so or to protect his or her own rights or interests or to save his or her own property. The doctrine of subrogation is not administered by courts of equity as a legal right, but the principle is applied to subserve the ends of justice and to do equity in the particular case under consideration. It does not rest on contract, and no general rule can be laid down which will afford a test for its application in all cases. The facts and circumstances of each case determine whether the doctrine is applicable.

*Id*. at 236 (internal citations omitted).

To recover on a subrogation claim, Dobson must establish that (1) it was compelled to hire subcontractors to replace Ratliff, either out of a legal or moral obligation to do so or to protect its own rights or interests; (2) the cost of those subcontractors should have been paid by ACIC pursuant to the bond issued by ACIC to Ratliff; (3) ACIC failed to pay those costs; and (4) Dobson paid the debt otherwise owed by ACIC to those subcontractors. *Id*. at 236.

In this situation, the amended complaint alleges (and the arbitrator found) that Dobson incurred costs and damages as a result of Ratliff's breach of contract and that Dobson paid the debts otherwise owed by Ratliff. (Filing 24, First Amended Complaint ¶¶ 33-35; Filing 131-12, Arbitrator's Award at CM/ECF pp. 2, 5.) It is reasonable to infer from the contractor-subcontractor relationship of Dobson and Ratliff, and from the arbitrator's findings, that Dobson most likely did not make these payments as a volunteer. Moreover, given the duties that Dobson owed to the Oklahoma Department of Transportation to perform on the prime contract, it is reasonable to infer that these payments were most likely made out of a moral or legal sense of obligation and to protect Dobson's own interests. *See Cagle*, 254 N.W.2d at 404 ("As a general contractor in a position where its subcontractor had withdrawn from the job, Cagle may well have had to make such payments to protect its own interests in the project, to enable itself to complete its contract with the owner, or to prevent liens from being filed on the property. This court has previously held that persons may be subrogated to the rights of materialmen in situations analogous to the one allegedly presented in this case.").

Thus, Dobson is entitled to assert a claim for relief under the payment bond under the principles of subrogation, and ACIC's motion for summary judgment on this ground must be denied as well.

## 2. Whether Dobson Failed to Meet Conditions Precedent in Performance Bond That Trigger ACIC's Liability

ACIC's final argument in support of its motion for summary judgment is that while Dobson could have properly asserted a performance bond claim against ACIC, such a claim is barred because Dobson did not satisfy the conditions precedent in the bond that would have triggered ACIC's liability. Specifically, ACIC argues that Dobson was bound—but failed—to: (a) notify ACIC via certified mail that Dobson was considering defaulting Ratliff; (b) attempt to arrange a conference with ACIC and Ratliff to discuss how the bonded subcontract could be performed; (c) declare Ratliff in default no earlier than 20 days after ACIC and Ratliff had been properly notified of Ratliff's default; and (d) agree to pay the remaining contract funds to ACIC so that ACIC could arrange for the completion of its principal's work under the bonded contract. (Filing 131-1 at CM/ECF p. 4.) Further, ACIC asserts that the performance bond required that ACIC consent to any change in Ratliff's subcontract that modified the contract by more than 15%, but neither Ratliff nor Dobson sought ACIC's approval for changes that increased the subcontract amount from $885,003.20 (original bond amount) to $1,531,721.47 (adjusted contract value as determined by arbitrator), an increase of approximately 73% of the original contract amount.

In a previous case involving similar performance-bond language, I concluded that providing notice of default and satisfying other bond conditions were "conditions precedent under Nebraska law, and . . . the surety's obligation to act under . . . the bond does not arise unless such conditions are met." *Developers Surety & Indemnity Co. v. Dismal River Club, LLC*, No. 4:07CV3148, 2008 WL 2223872 at *8 (D. Neb. May 22, 2008) (analyzing paragraph 3 of AIA A312 standard-form performance bond).

> "Where a guarantor attaches a certain condition or conditions to the agreement, such condition or conditions must be construed in favor of the guarantor, and the failure of a creditor to strictly comply with any condition or conditions invalidates the guaranty. A stipulation for notice

of default is a condition of liability which may always be imposed. Where a contract of guaranty specifically requires notice of default, the failure to give such notice discharges the guarantor's obligations."

*Id*. (quoting *State ex rel. Wagner v. Amwest Sur. Ins. Co.*, 738 N.W.2d 805, 811 (Neb. 2007)).

In *Dismal River*, I found that although there may have been a jury issue as to whether the bond's notice-of-default provision was satisfied, the surety was not liable on the bond because there was "no evidence" that the other conditions were satisfied, and there was "no evidence" that those conditions were waived. *Id*.

Here, the parties have filed evidence creating a genuine issue of material fact regarding whether Dobson satisfied its obligations in the performance bond to provide timely sufficient notice of Ratliff's eventual default; to arrange a conference to discuss how the bonded subcontract could be performed; and to provide proper notice and obtain approval for expenditures that could have increased the amount of the contract by more than 15%.[5] Further, the parties have presented evidence creating material

---

[5]Filing 131-4 (performance bond); Filing 131-6, Dobson's Response to ACIC's First Requests for Admissions ¶¶ 18-22, 25-27 (Dobson claims its first attempt to contact ACIC regarding Ratliff's nonperformance was October 22, 2007; admits that October 22 letter did not request conference; and admits that Dobson's December 12, 2007, letter to ACIC did not contain request to ACIC to participate in conference to discuss Ratliff's failure to perform, nor did letter offer to pay to ACIC contract funds to allow ACIC to complete the project pursuant to bonded subcontract terms); Filing 131-7, Olson Dep. CM/ECF p. 10 (at time Dobson removed Ratliff from project, Dobson "could have" given funds to ACIC to allow it to perform, "but we didn't" because "[w]e didn't think it was appropriate" and Dobson "chose not to"); Filing 153-1, Olson Decl. ¶¶ 6, 7, 11, 19 & Exs. 1-D, 1-E (Dobson sent ACIC two notices on October 22, 2007, and December 12, 2007, detailing Ratliff's non-performance on project; when Dobson contacted ACIC in December 2007, "no monies remained to be paid under the Contract by virtue of the delay damages incurred by Dobson as well as the backcharges incurred to that date"); Filing 131-3, Lanak Aff. ¶¶ 8, 9, 14, 15

questions of fact regarding whether ACIC excused, waived, or otherwise relieved Dobson of these obligations; whether performance of these acts would have been futile; and whether ACIC consented or otherwise acquiesced to the changes in the subcontract that exceeded 15% of the contract amount.[6] Because "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," *Jackson*, 643 F.3d 1081, at 1085, I shall deny ACIC's motion for summary judgment regarding its liability on the performance bond.

---

(acknowledging that ACIC received December 2007 letter from Dobson concerning Ratliff's nonperformance, but stating that ACIC's files do not contain the alleged October 2007 letter); Filing 154 at CM/ECF p. 10 n.3 ("[ACIC] has always maintained that it did not receive [the October 2007] correspondence, and as [Dobson] did not send the notice certified mail (as required by the bond) there is no record of receipt in [Dobson's] records.").

[6]Filing 131-7, Olson Dep. at CM/ECF pp. 11-12 (penal sum of contract increased due to change orders, and Dobson "didn't receive any approval of anything" regarding an increase); Filing 131-9, Lanak Dep. at CM/ECF p. 16 ("Dobson . . . should have let us know beforehand and got our consent if they thought it was going to be in excess of 15 percent . . . because it changes the underlying risk that we're assuming. . . . had we been asked it at the time we would not have consented"); Filing 131-9, Lanak Dep. at CM/ECF p. 20 ("the eventual arbitration award . . . found that Ratliff had done a significant amount of extra work dollarwise far in excess of 15 percent of the $885,000 . . . original subcontract amount"); Filing 131-3, Lanak Aff. ¶¶ 20-22 (neither Ratliff nor Dobson sought ACIC's consent for changes in scope of work that increased value of subcontract by 73%; first notice ACIC was given of changes that *might* increase scope of Ratliff's work beyond 15% was in December 17, 2007, letter from Dobson stating Dobson "did not know" if contract changes would exceed 15% and attaching backcharges made thus far); Filing 153-1, Olson Decl. ¶¶ 6-10, 18 & Exs. (letters allegedly sent by Dobson to ACIC notifying it of Ratliff's performance problems; "prior to Ratliff's termination, I personally directed Dobson staff to work with ACIC in providing any needed information in connection with Ratliff's default on its obligations under the Contract. Further, I am personally aware that numerous communications in fact took place between Dobson employees and ACIC with regard to Ratliff's performance on this Project.").

## D. CONCLUSION

For the reasons discussed above, Dobson can assert a direct claim against ACIC under the payment bond, as well as a claim under the principles of subrogation. Further, there are genuine issues of material fact regarding whether Dobson failed to meet the conditions precedent in the performance bond that would trigger ACIC's liability. Therefore, ACIC's motions must be denied and this case may proceed to trial.

IT IS ORDERED:

1. ACIC's motion for partial judgment on the pleadings (filing 42) is denied as moot;

2. ACIC's motion for summary judgment (filing 131) is denied;

3. This matter is referred to Magistrate Judge Zwart to schedule trial.

DATED this 10th day of April, 2012.

BY THE COURT:
s/ *Richard G. Kopf*
Senior United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites. The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites. Likewise, the court has no agreements with any of these third parties or their Web sites. The court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.